**Ben and Audrey DELANCY, as Co–Administrators and on Behalf of Estate of Dr. Herman Delancy, Plaintiffs–Appellants,**

v.

**ST. PAUL FIRE & MARINE INSURANCE CO., Defendant–Appellee.**

No. 89–8715.

United States Court of Appeals, Eleventh Circuit.

Dec. 6, 1991.

Brent J. Savage, Dorothy W. Courington, Laura J. Tromly, Adams, Gardner, Ellis, Inglesby & Falligant, Savannah, Ga., for plaintiffs-appellants.

Earl W. Gunn, Sidney F. Wheeler, Glenn E. Kushel, Roger Mills, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., Frank W. Seiler, Bouhan, Williams & Levy, Savannah, Ga., for defendant-appellee.

Before TJOFLAT, Chief Judge, CLARK * and ESCHBACH **, Senior Circuit Judges.

TJOFLAT, Chief Judge:

In this tort action, the representatives of Dr. Herman Delancy's estate sued St. Paul Fire and Marine Insurance Company (St. Paul), Dr. Delancy's malpractice liability insurer, for negligent or bad faith failure to settle a suit against Dr. Delancy. The district court granted summary judgment to St. Paul, and the plaintiffs appeal.[1] The plaintiffs ask us to hold, under Georgia law, that when a liability insurer knows or in the exercise of ordinary care should know that a suit against its insured could be settled within the policy limits and that its failure to settle will expose the insured to an unreasonable risk of harm, including emotional distress, the insurer has a duty to effect a settlement within a reasonable time after settlement is possible; if the insurer breaches this duty, it is liable for all damages proximately caused by its breach.

We assume for the sake of argument that the plaintiffs correctly state Georgia law. We nonetheless affirm the district court's grant of summary judgment to St. Paul, as the plaintiffs have not introduced competent evidence showing a genuine issue of material fact on an element of their case on which they have the burden of proof: they have not shown that St. Paul ever knew or in the exercise of ordinary care should have known that the suit against Dr. Delancy could have been settled within the policy limits.

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. We have jurisdiction over the case pursuant to 28 U.S.C. § 1332 (1988) because the parties are citizens of different states.

## I.

In 1974, Dr. Delancy performed liver biopsy surgery on Herbert Ross at the Memorial Medical Center (Memorial) in Savannah, Georgia. During the operation, Dr. Delancy or someone on the surgical team left a surgical instrument, probably a needle holder, in Ross' body. When the procedure was performed, St. Paul provided liability insurance to both Dr. Delancy and Memorial. The limit of Dr. Delancy's coverage was $100,000; Memorial's limit was $1 million.

In the years after the operation, Ross suffered abdominal discomfort and digestive problems. In 1985, he began to feel sharp pains in his abdomen and back; in July of that year, a chiropractor took X-rays which revealed that there was a foreign object in Ross' abdomen but did not show its exact location. On May 5, 1986, twelve years after the operation, Ross sued Dr. Delancy and Memorial in Georgia state court; he alleged that both the doctor and the hospital had been negligent and had breached implied and express warranties. Samuel Svalina (a South Carolina attorney) represented Ross and had the most contact with him during the litigation of his claim; Thomas Taggart (a Savannah attorney) served as Ross' local counsel.

Pursuant to the terms of its contracts with its insureds, St. Paul undertook the defense of Ross' suit. It retained attorney William Pinson to defend Dr. Delancy, hired another attorney to defend Memorial, and assigned adjuster Lori Merryman to both of Ross' claims. Because it was possible that his liability might exceed his policy limits, Dr. Delancy retained attorney Stanley Karsman to represent his interests.

On July 2, Pinson filed an answer to Ross' complaint, asserting that the statute of limitations barred Ross' claim against Dr. Delancy. Pinson also moved to strike the breach of warranty claims. In response, the court ordered Ross to eliminate those claims from the complaint. Meanwhile, Pinson began discovery; he filed interrogatories and requests for production and, on August 27, 1986, took Ross' deposition.

Early in the litigation, Karsman (Dr. Delancy's personal attorney) began urging Taggart (Ross' local counsel) and St. Paul to settle the case for the policy limits of $100,000 or less.[2] In late August 1986, Karsman and Taggart evidently discussed settlement. On September 3, Karsman wrote Pinson that he had been led to believe (presumably by Taggart) that the claim against Dr. Delancy could be settled within the policy limits. On September 26, Karsman wrote Taggart, informing him that Dr. Delancy had physical and emotional problems resulting from the litigation, asking Taggart to tender a demand under St. Paul's policy limits, and promising him that if he tendered such a demand, Karsman would put "as much heat on St. Paul as possible to get the case settled." On September 30, Pinson (for Dr. Delancy and St. Paul) wrote Taggart and asked him to tender a settlement demand.

On October 16, 1986, Pinson moved for summary judgment on Ross' claim against Dr. Delancy, arguing that the statute of limitations barred Ross' claim. Georgia imposes a one-year statute of limitations on medical malpractice claims, which begins to run, in a foreign object case, when a person either discovers or (Pinson argued) through the reasonable exercise of diligence should discover the foreign object. Pinson contended that because Ross was complaining about a twelve-year history of pain, and because one of his doctors had told him to return to Dr. Delancy for consultation some time before the X-ray revealed the object, Ross should have discovered the object before 1985; therefore, his suit was barred.

Dr. Delancy's codefendant, Memorial, also moved for summary judgment, arguing that it was not liable to Ross for two reasons: (1) at the time of the 1974 procedure, it was not standard operating procedure in the Savannah area for hospitals to

---

2. Karsman notified St. Paul on July 7, 1986, and at several other times throughout the litigation, that Dr. Delancy's health was poor and that the litigation could adversely affect it. He also provided St. Paul with copies of letters from Dr. Delancy's physicians warning of this situation.

require an instrument count after surgery and (2) under the "borrowed servant" doctrine, all of the hospital employees in the operating room were under Dr. Delancy's immediate control and the hospital, therefore was not responsible for their behavior.

On November 3, Karsman wrote to Pinson again demanding that St. Paul offer to settle for the policy limits. On November 10, Pinson responded, stating that he had made numerous unsuccessful attempts to obtain a settlement demand from Ross and that Ross' attorneys had never indicated that Ross would settle within policy limits; he confirmed this in his deposition in the instant case. Sometime in November, the parties argued Dr. Delancy's summary judgment motion, focusing on the statute of limitations issue.

On December 18, 1986, Taggart tendered Ross' first settlement offer to Karsman: Ross would take $250,000 to settle the suit against both Dr. Delancy and Memorial. By January 13, 1987, St. Paul had not responded to this offer; Karsman wrote Pinson on that date, stating that both he and Taggart were "extremely upset" and "shocked" at St. Paul's failure to respond.

On January 22, 1987 (before the trial court had decided the summary judgment motion on the statute of limitations issue), St. Paul's adjuster, Merryman, offered Taggart $40,000 to settle the claim against Dr. Delancy; when she made this offer, Merryman told Taggart that the offer was nonnegotiable and that St. Paul would make no settlement offer for Memorial. On January 28, Karsman again demanded that St. Paul offer its policy limits to settle the case against Dr. Delancy and stated that he was "reasonably certain" that $100,000 would settle the case.[3]

On February 24, 1987, the trial court denied Dr. Delancy's motion for summary judgment on the statute of limitations issue; it also denied Memorial's summary judgment motion. Pinson did not apply for permission to take an interlocutory appeal[4] on the statute of limitations issue, but Memorial did apply for and did receive permission to take an interlocutory appeal of the trial court's denial of its summary judgment motion.

Pinson, meanwhile, continued discovery by taking the depositions, on October 13, 1986 and March 3, March 4, and April 29, 1987, of the doctors who had examined Ross and would act as his expert witnesses. Pinson also had a doctor examine Ross' medical records on behalf of Dr. Delancy (and St. Paul). Pinson appears to have had some difficulty in scheduling the depositions of Ross' doctors. He first requested that Taggart schedule the depositions on September 30, 1986, and on October 29 he wrote complaining that Taggart had not responded to his request. On December 8, 1986, he wrote Taggart complaining that Taggart, "[d]espite repeated requests," had not cooperated in setting depositions and asking for an extension of time for discovery.

After discovery was completed, it was clear to all involved in the litigation that Dr. Delancy or someone on the surgical team had left a surgical instrument in Ross' body during the 1974 procedure, and that Dr. Delancy was probably liable for any damages Ross suffered as a result. There were, however, several remaining disputed issues of causation and damages, including the location of the foreign object within Ross' body, Ross' fitness for surgery to remove the object, and whether Ross' problems were caused by the foreign object or were products of his obesity and an earlier intestinal bypass procedure that Dr. Delancy had performed. Moreover, the statute of limitations issue (whether Ross

---

3. Karsman added that he thought Merryman's representation of both Dr. Delancy and Memorial was a conflict of interest. Two months later, St. Paul assigned another adjuster to Memorial, while Merryman continued to handle Ross' claim against Dr. Delancy.

4. Ga.Code § 5-6-34(b) (1982) provides that when a trial judge certifies that a judgment "not otherwise subject to direct appeal" is "of such importance to the case that immediate review should be had," and a party to the case petitions the court of appeals to hear its appeal from such a judgment, the court of appeals, in its discretion, may permit an interlocutory appeal.

should have discovered the object before he did) remained a fact question for the jury.

First, it was unclear whether the surgical instrument was beneath Ross' skin (in the subcutaneous layer of fat) or within his abdominal cavity.[5] This question was relevant to both causation and damages. If the object was just beneath the skin, it was unlikely to have caused Ross' symptoms and could be easily removed. If it was within his abdominal cavity, it was more likely to have caused his problems, and surgery to remove it would become more difficult and expensive. By July 20, 1987, however, St. Paul seems to have concluded that only a "slight possibility" remained that the object was outside the abdominal cavity. Second, it was unclear whether Ross was a good candidate for surgery to remove the object; he was obese and had health problems that might make general anesthesia dangerous. If Ross was not a good surgical risk, this would increase his damages. Finally, it was unclear whether the object, wherever it was located, was causing Ross' symptoms.[6]

Many of the disputed issues in the suit, especially the location of the object, probably could have been resolved by an independent medical evaluation and surgical work-up of Ross including more extensive testing. St. Paul began discussing the possibility of such a procedure with Ross' counsel and with its insured and his attorney by early 1987. Although their approval was not necessary, Karsman notified the company on behalf of Dr. Delancy that they were opposed to such a procedure (because it was possible that it could damage Dr. Delancy's case),[7] but finally admitted by July 20 that an evaluation would be helpful.

It is apparent from the record that Dr. Delancy and his personal attorney, Karsman, disagreed on these disputed issues and the value of Ross' suit.[8] In a letter to Pinson on November 3, 1986, Karsman stated that

It has been obvious from the outset that a surgical instrument was left in Mr. Ross' abdomen following the 1974 surgery. The overwhelming evidence to date shows that Mr. Ross, because of a variety of health problems, is a very poor surgical risk. At this point, Plaintiff's [sic] have furnished you with one medical report indicating that the presence of the needle holder is either is [sic] currently or might in the future cause Mr. Ross to suffer from a bowel obstruction and/or other complications. *There is absolutely*

---

**5.** According to summaries prepared by Pinson and sent to Karsman and Dr. Delancy, Ross' physicians testified on deposition that they felt, because they could not palpate the object, that it was within the abdominal cavity; the surgeon who reviewed the file on behalf of St. Paul felt that it was beneath the skin.

**6.** According to summaries prepared by Pinson and sent to Karsman and Dr. Delancy, Ross testified in his deposition that none of his doctors had told him that his symptoms were related to the object. One of Ross' doctors stated that he had no opinion as to whether the surgical instrument was linked to Ross' symptoms, but he did not feel that the pain in Ross' abdomen was due to a foreign object; it might, instead, be a function of infection, tumor, or diverticulitis. Another testified that the sharp pains in Ross' back, which led to the X-ray that disclosed the object in 1985, might have been caused by Ross' obesity, but added that he thought that the instrument might be cutting off a portion of Ross' circulation. Another expert who had previously stated that the instrument might have caused adhesions in Ross' abdomen testified in deposition that he had based this

diagnosis solely on information Ross had given him and not on past medical records or an examination of Ross.

**7.** Karsman stated, in a letter to Pinson on January 13, 1987, that he was opposed to tests to determine the location of the object, because if such procedures showed that it was in the abdomen they "could be very damaging to the defense."

**8.** Karsman, however, appears to have believed that whatever their differences, Dr. Delancy would have handled the case as Karsman advised. In deposition, Karsman stated that although he and Dr. Delancy may have disagreed about some aspects of the case, because Dr. Delancy "never wanted to admit" either that he had left the instrument in Ross or that it was causing Ross' symptoms, Dr. Delancy "recognized the fact that there were perhaps and probably would be qualified physicians who would testify at the trial ... contrary to ... his opinions." Karsman added that "I was the lawyer, and he was the doctor, and I didn't feel like he should be evaluating the case. That's what he was paying me to do, in part."

*nothing to gain by continuing to litigate this matter....*
(Emphasis added.) On January 13, 1987, Karsman added that St. Paul should stop "defending th[e] case as if Dr. Delancy did absolutely nothing wrong" and urged that Pinson amend Dr. Delancy's answer to admit liability.

Dr. Delancy, on the other hand, seems to have felt that the object probably was not causing Ross' problems and that Ross therefore could prove no damages at trial; he notified St. Paul of this opinion several times during the litigation. In a handwritten letter to Pinson in early 1987, for instance, Dr. Delancy stated:

> *This instrument has not caused any of the plaintiff's problems and it is highly unlikely that it ever will cause difficulty.* All his complaints either preexisted or are common [and] well published side effects of [intestinal] bypass. I can get many surgeons to testify to that [and] can also provide that evidence out of authoritative text books and journals.

(Emphasis added.) In deposition, Pinson stated that Dr. Delancy had indicated to him "[o]ver and over again" that he felt that Ross' settlement demands were "absurd, that the case was not worth what [Ross and his attorneys] had indicated that it was." Dr. Delancy also informed Merryman, according to her deposition, that he felt that Ross had no damages. Dr. Delancy's wife, Audrey, however, testified (after she brought the instant suit) that Dr. Delancy felt that Ross had a valid claim and that St. Paul should settle the suit.

Despite these unresolved causation and damages issues and the opposing assessments of the case it was receiving from its insured and his personal attorney, by early 1987 St. Paul seems to have decided that it would have to pay a fairly high amount to settle Ross' claim against Dr. Delancy and to have estimated Dr. Delancy's chance of success as poor if the case went to a jury. In his first report to St. Paul, on June 11, 1986, Pinson had estimated a settlement value of $15,000 and a probable verdict of $75,000; he felt that Dr. Delancy had a twenty percent chance of winning if the case went to trial. On November 14, 1986, St. Paul set its loss reserve [9] on the case at $100,000, the policy limits. By January 1987 (when she offered Ross $40,000), Merryman's superiors at St. Paul authorized her to settle Ross' claim against Dr. Delancy for up to $50,000. In March 1987, Pinson increased his estimate of possible liability if the case were tried to $200,000 and decreased his estimate of Dr. Delancy's chance of success at trial to fifteen percent.[10] In mid-April 1987, Merryman recommended to her superiors that St. Paul tender its policy limits to settle the suit.

The next development in the litigation occurred on May 14, 1987, when Pinson wrote Dr. Delancy that Svalina (Ross' South Carolina attorney) had indicated to Pinson that Svalina and Ross would soon meet and that Svalina hoped to return with a reasonable demand within the policy limits. Four days later, on May 18, Taggart conveyed Ross' second settlement demand to Karsman: contrary to Svalina's assertion that Ross might make an offer within the policy limits, Ross would take $125,000 to settle the case against Dr. Delancy.

On May 19, Taggart relayed this $125,000 offer to Merryman on the telephone; he evidently informed her that Karsman had told him during their conversation the day before that Karsman would advise Dr. Delancy to contribute $25,000 towards settlement and that Dr. Delancy probably would pay this amount.[11]

---

9. There is conflicting testimony on how St. Paul set its loss reserve. Merryman and other St. Paul employees stated in deposition that a loss reserve is the insurance company's estimate of its maximum exposure, but does not reflect the company's valuation of the claim. Steve Dill, the St. Paul adjustor who handled Ross' claim against Memorial after it was reassigned from Merryman, stated in deposition, however, that a reserve is an estimate of the insured's liability.

10. Merryman also testified that she thought it was more likely than not that if the case went to a jury, Dr. Delancy would lose. Louis Smith, Merryman's direct supervisor at St. Paul, agreed that liability was probable.

11. Evidence of the contents of this telephone conversation between Merryman and Taggart appears in a letter Pinson wrote Karsman on June 2 confirming St. Paul's impression of Karsman's conversation with Taggart.

On May 20, Karsman wrote to inform Pinson that Ross had offered $125,000. He added that Taggart had stated, during their May 18 conversation, that he had written authorization from Ross only to offer $125,000 but that he (Taggart) thought that Ross would "seriously consider" an offer of $110,000. Karsman told Pinson in this letter that he had not yet told Dr. Delancy about the $125,000 offer, but that he would have a "serious discussion" with him about the possibility of contributing approximately *$10,000* of his personal funds.[12]

On June 2, Pinson wrote Karsman, relaying his understanding (based on Merryman's report of her May 19 telephone conversation with Taggart) that Karsman had told Taggart that Karsman would recommend that Dr. Delancy contribute $25,000 towards settlement. On June 3, Karsman responded; he denied that he had ever engaged in settlement negotiations with Taggart or that he had told Taggart that Dr. Delancy would make any contribution whatsoever towards settlement. Karsman added that Dr. Delancy had authorized him to inform St. Paul that Dr. Delancy would pay $10,000 (not $25,000) towards settlement if St. Paul would offer its policy limits. He asserted, moreover, that he had not told Taggart about Dr. Delancy's willingness to pay $10,000 and did not intend to tell him.

On June 19, Taggart wrote Merryman confirming what both he and Karsman had notified St. Paul of earlier—that Ross would settle his suit against Dr. Delancy for $125,000—and setting a deadline of July 8 for St. Paul to accept the offer; Taggart also stated that Ross would settle against both defendants for $225,000.[13] In

this letter, Taggart mentioned that Memorial's interlocutory appeal of the trial court's denial of its motion for summary judgment, *see supra,* p. 1538–39, was set for argument in the Georgia Court of Appeals on June 30 and stated that Ross' offer to settle with Dr. Delancy for $125,000 was predicated on Memorial's remaining in the case. If Ross' claim against Memorial was dismissed on appeal, Taggart implied, St. Paul and Dr. Delancy would have to pay much more than $125,000 to settle the case.

St. Paul responded, on July 6, by notifying Taggart that it was willing to submit the case to nonbinding arbitration. Ross declined this offer by the end of July. The July 8 deadline for acceptance of Ross' $125,000 offer passed without further action by St. Paul.

Karsman, meanwhile, was becoming concerned that if the court of appeals reversed the trial court and dismissed Ross' case against Memorial, Ross would look to Dr. Delancy for the full $225,000 he had demanded to settle the case against both defendants. Accordingly, Karsman again informed St. Paul, in letters of July 7 and September 28, that he thought Ross would take $110,000 and urged it to offer the policy limits or the policy limits plus the $10,000 that Dr. Delancy was willing to pay.[14]

On August 12, 1987, on the other hand, Dr. Delancy again informed Pinson that he thought Ross' case had serious flaws. Dr. Delancy stated that he had spoken to another surgeon about being an expert witness, and that this doctor and Dr. Delancy agreed that

---

12. On May 29, Merryman wrote Karsman and Dr. Delancy that by the terms of Dr. Delancy's policy, "the insured and his personal attorney 'will refrain from taking any financial obligations or paying out any money without our authorization. Doing so may result in our not making reimbursement of the payment, even though the cost is covered by the policy.'" She added that it was "a violation of the policy to discuss settlement with Mr. Taggert [sic] without my written permission or consent." On June 11, Merryman wrote to clarify her earlier letter. She denied that she had said that receiving a settlement offer was a violation of the

policy, but told Karsman that Dr. Delancy should refrain from agreeing to pay or paying money without St. Paul's authorization.

13. In this letter, Taggart complained about St. Paul's conduct in negotiations and stated that only Karsman's "many inquiries" had led to the settlement offer.

14. He warned St. Paul, moreover, that Dr. Delancy would look to St. Paul for reimbursement of any money he contributed towards settlement or judgment.

(1) Absolutely no damage has been done [by the object]

(2) It is highly unlikely that any damage will ever be done

(3) It doesn't really matter where the needle holder is located

(4) 98% of a study group [on intestinal] bypass had the same symptoms.[15]

Dr. Delancy also wrote Pinson that "if this case goes to trial I know [Ross] will get something but if we play our cards right it should be mighty little. I believe the other side knows that as well [and] in the end I believe this can be settled."

On September 25, Pinson wrote Taggart requesting that Ross undergo an independent medical evaluation at St. Paul's expense. St. Paul, however, never petitioned the court to order Ross to undergo such an evaluation.

On October 2, the Georgia Court of Appeals granted summary judgment to Memorial, leaving Dr. Delancy as the sole defendant.[16] The following week, on October 9, Merryman requested $100,000 in settlement authority and indicated, in an internal memorandum memorializing a telephone conference with Taggart, that Taggart had told her that Karsman had "assured" Taggart that Dr. Delancy would pay $25,000 to settle the case. On the same day, her supervisors gave her $100,000 authority, and she offered Ross $75,000. On October 19, Karsman again demanded that St. Paul offer its policy limits; on the same day, Dr. Delancy sent another letter to Pinson, stating that the defense could "clobber" Ross in court. Dr. Delancy added that Ross did not "ha[ve] much going for him in the way of damages."

On November 10, Dr. Delancy suffered a heart attack and stroke and entered a coma. Karsman notified Merryman of this on November 11 and again demanded that St. Paul offer the policy limits. Four days later, on November 16, Dr. Delancy's son Ben, anxious to settle the suit, told Karsman that if St. Paul paid the policy limits, Ben would contribute the amount necessary to settle the case above the limits. Karsman and Ben Delancy went to Pinson's office and called Merryman. They asked her to authorize them to offer Ross $100,000. She stated that she had authority only to offer $75,000; this was untrue, as St. Paul had granted her settlement authority of $100,000 on October 9. After some difficulty, they persuaded her to call her supervisor, Louis Smith, to the phone; he told them that St. Paul would offer its policy limits.

They then contacted Taggart to settle the case. Karsman testified that he wanted to negotiate, but Ben Delancy directed him to offer whatever it took to get the case settled, and got "very upset" when Karsman "started talking to Taggart about paying less than $125,000"; Taggart later confirmed that Ben Delancy did not want to negotiate. Taggart ultimately persuaded Ross to make a settlement offer of $120,000, which St. Paul and Ben Delancy accepted. On November 25, Dr. Delancy died. After his death, St. Paul paid Ross $100,000, its policy limits, and Dr. Delancy's estate paid $20,000.

## II.

After Dr. Delancy's death, his wife and son, as co-administrators of his estate, sued St. Paul for its negligent[17] and bad faith

---

**15.** In a sharply contrasting letter of June 19, 1987, Karsman stated:

> There is no dispute about the fact that a surgical instrument was left in Mr. Ross' abdomen. There is credible medical testimony and evidence in the case that indicates that the instrument needs to be removed. The surgery to remove the instrument will be expensive. Mr. Ross is an extremely poor surgical risk. There is a reasonable chance that Mr. Ross would not survive a surgical procedure to remove the instrument.

**16.** The Georgia Supreme Court later reversed, reinstating Memorial. When the case against Dr. Delancy settled, *see infra* p. 1543, Ross' application for certiorari to the Georgia Supreme Court was pending.

**17.** In their amended complaint, the plaintiffs charged only that St. Paul breached its duty of good faith to Dr. Delancy. Throughout the litigation in the district court and on appeal, however, they have maintained that they claim both negligent and bad faith failure to settle. We construe the plaintiffs' amended complaint lib-

failure to effect a settlement of Ross' suit within Dr. Delancy's policy limits in a timely fashion.[18] St. Paul moved for summary judgment, arguing that, under Georgia law, an insured may sue his liability insurer for tortious failure to settle only when the insured shows that (1) the insurer refused an offer to settle within the policy limits made by the injured party and (2) a judgment in excess of the policy limits was entered against the insured. The plaintiffs contended that an offer within limits and an excess judgment are not prerequisites for their claim.

The district court found that Georgia law requires an offer within limits and an excess judgment. It held, first, that a fact issue remained as to whether St. Paul "was under the impression" that it had received a "constructive offer" to settle within its policy limits—Ross had offered $125,000, and St. Paul may have believed Dr. Delancy would be willing to pay $25,000. This issue of fact was not material, however, because there was no excess judgment, the second prerequisite to a tortious failure to settle claim. Accordingly, the district court granted St. Paul's motion for summary judgment.[19]

### III.

■ Our review of a district court's grant of summary judgment is plenary; we will affirm the district court if, after construing the evidence in the light most favorable to the nonmoving party, we find that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Eastern Air Lines v. Air Line Pilots Ass'n Int'l*, 920 F.2d 722, 724 (11th Cir. 1990). The movant bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the nonmovant, in response, fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the movant is entitled to summary judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2552.

■ We find, contrary to the district court, that Georgia law is unclear as to whether an insurer's duty to settle a case arises only when there is an offer within the policy limits and an excess judgment is rendered; support exists for both plaintiffs' and St. Paul's positions. We assume, for the sake of argument, that Georgia law does not impose these requirements and that, therefore, an insurer's duty to settle a case within the policy limits arises when the insurer knows, or in the exercise of ordinary care should know, that such a settlement is possible and that its failure to effect a settlement will expose its insured to an unreasonable risk of harm, including emotional distress. Moreover, we assume that an insured may recover all damages proximately caused by the insurer's breach

erally to state a cause of action for negligent, as well as bad faith, failure to settle.

18. The plaintiffs also claimed, in their amended complaint, that St. Paul breached its duty of good faith to Dr. Delancy by assigning one adjuster, Lori Merryman, to both Dr. Delancy and Memorial. The plaintiffs prayed for no separate relief on this claim, and the only possible injury they may have suffered is a delay in settlement, caused by Merryman's connection of St. Paul's initial offer to settle the case against Dr. Delancy for $40,000 to her assertion that St. Paul would not make an offer for Memorial, which the plaintiffs argue discouraged Ross from making settlement offers. We do not consider this as a separate claim, but take it as part

of the claim that St. Paul negligently or in bad faith failed to settle the suit.

19. The plaintiffs also claimed that St. Paul intentionally inflicted emotional distress on Dr. Delancy and proximately caused his wrongful death. At oral argument in the district court on St. Paul's motion for summary judgment, the plaintiffs stipulated that they would have to be successful on their tortious failure to settle claim for them to recover on their other claims. Because it found that St. Paul was entitled to summary judgment on the failure to settle claim, the district court also granted St. Paul's motion for summary judgment on the other two claims. Only the failure to settle claim is at issue in this appeal.

of its duty to settle, including damages caused by a delay in settlement.

The plaintiffs, however, have introduced no competent evidence that shows that St. Paul knew or reasonably should have known that it could have settled the suit for Dr. Delancy's policy limits (or for the policy limits plus an amount Dr. Delancy had notified St. Paul that he was willing to pay) at any time before settlement actually occurred.[20] Because the plaintiffs have failed to adduce evidence of a genuine issue of material fact on an essential element of their suit on which they have the burden of proof, St. Paul is entitled to summary judgment as a matter of law.[21]

### A.

▮ Under Georgia law, a plaintiff may not sue in tort for a defendant's mere breach of a duty imposed by a contract. *Sheppard v. Yara Engineering Corp.*, 248 Ga. 147, 281 S.E.2d 586, 587 (1981) ("an action in tort may not be maintained for what is a mere breach through non-action or through ineffective performance (which is the same thing) of a contract duty");

20. If the plaintiffs had established a factual dispute as to whether the case could have been settled within the policy limits, we would have certified the case to the Georgia Supreme Court for clarification of Georgia law.

21. The plaintiffs also claim that the district court erred by refusing to set aside its judgment pursuant to Fed.R.Civ.P. 60(b) or to allow them to amend their complaint after the judgment had been entered. Throughout the Ross litigation, Dr. Delancy and Karsman repeatedly asked St. Paul to provide them with a copy of Dr. Delancy's insurance policy; during the present case, the plaintiffs also asked St. Paul to give them a copy of the policy. St. Paul failed to do so, claiming that because Dr. Delancy's policy was issued in 1974, it could not locate a copy. After the district court granted summary judgment to St. Paul in the instant suit, the plaintiffs obtained a copy of a policy similar to Dr. Delancy's which, they asserted, showed that Merryman's letters of May 29 and June 11, 1987 notifying Karsman and Dr. Delancy that certain actions were a violation of Dr. Delancy's policy, *see supra* note 12, were misleading.

The plaintiffs then moved, pursuant to Fed. R.Civ.P. 60(b), for relief from the judgment. The district court vacated its order granting summary judgment for thirty days to allow

*First Fed. Sav. Bank v. Fretthold*, 195 Ga.App. 482, 394 S.E.2d 128, 129–30 (1990); *Mauldin v. Sheffer*, 113 Ga.App. 874, 150 S.E.2d 150, 153 (1966). If, however, the defendant breaches a duty imposed by tort law independent of the contract to avoid harming the plaintiff, *Sheppard*, 281 S.E.2d at 586; *Bowen & Bowen, Inc. v. McCoy–Gibbons, Inc.*, 185 Ga.App. 298, 363 S.E.2d 827, 830 (1987); *Mauldin*, 150 S.E.2d at 153, and the plaintiff sustains damages other than the loss of the benefit of the contract, the plaintiff may sue in tort, *Davis v. Aetna Casualty & Surety Co.*, 169 Ga.App. 825, 314 S.E.2d 913, 918, *aff'd in part and rev'd in part*, 253 Ga. 376, 320 S.E.2d 368 (1984); *accord Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir.1982) (applying Georgia law). This independent duty may be "found because of the relationship between the parties, or because of defendant's calling or because of the nature of the harm." *Sheppard*, 281 S.E.2d at 587 (emphasis omitted); *see also Fretthold*, 394 S.E.2d at 129; *Mauldin*, 150 S.E.2d at 153–54.

▮ The contractual relationship between insurer and insured creates such an

plaintiffs to attempt to find the original policy. After St. Paul produced a document which, although not an exact copy of the policy issued to Dr. Delancy, contained the terms and conditions of Dr. Delancy's policy, plaintiffs moved to amend their complaint to add claims against St. Paul for fraud and deceit (by misrepresenting the terms of Dr. Delancy's policy to him) and breach of fiduciary duty (by refusing to produce a copy of the policy) and again moved for relief from the judgment. The court then reinstated its prior order granting summary judgment to St. Paul—effectively denying plaintiffs' Rule 60(b) motion for relief from the judgment—and dismissed as moot the plaintiffs' motion to amend their complaint.

We will overturn a district court's denial of a motion to set aside a judgment pursuant to Fed.R.Civ.P. 60(b) only if the district court has abused its discretion. *Gulf Coast Fans, Inc. v. Midwest Elecs. Importers, Inc.*, 740 F.2d 1499, 1510 (11th Cir.1984). The denial of a motion to amend a complaint also lies in the sound discretion of the district court, *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines*, 713 F.2d 618, 622 (11th Cir.1983), and we will reverse only if it has abused that discretion, *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. Jan. 1981). We are unwilling to find such abuses of discretion here; we therefore do not overturn the district court's rulings.

independent duty, implied from the terms of the contract, between insurer and insured: the insurer "owes to the insured a duty independent of the contract not to injure him, and when, from its negligent failure or refusal to adjust a claim, or from fraud or other bad faith, he sustains damages other than damages covered by the insurance contract, then an action in *tort* would be appropriate."[22] *Leonard v. Firemen's Ins. Co.*, 100 Ga.App. 434, 111 S.E.2d 773, 776 (1959) (emphasis added); *see also Alexander Underwriters Gen. Agency, Inc. v. Lovett*, 182 Ga.App. 769, 357 S.E.2d 258, 262, 265 (1987) (when insurer failed to accept offer of settlement and refused to defend issue of damages after offer was made, suit was "not upon the contract of insurance but rather in tort and involved a duty by the insured [sic] and an alleged breach of that duty"); *Smith*, 339 S.E.2d at 329 (distinguishing contract action for insurer's failure to defend a suit from "tort case involving a non-contractual duty to settle"); *Davis v. Cincinnati Ins. Co.*, 160 Ga.App. 813, 288 S.E.2d 233, 237 (1982) (*Davis II*) (distinguishing contract action for insurer's denial of coverage and failure to defend from tort action for failure to settle); *United States Fidelity & Guar. Co. v. Evans*, 116 Ga.App. 93, 156 S.E.2d 809, 811 ("the insured's suit is not upon the contract but rather in tort and naturally involves a duty and an alleged breach of that duty"), *aff'd*, 223 Ga. 789, 158 S.E.2d 243 (1967); *see generally* 14 G. Couch, R. Anderson & M. Rhodes, Cyclopedia of Insurance Law, § 51.25 (rev. ed. 1982).[23]

■ Because this suit is in tort, therefore, the insured may sue the insurer for failure to settle only when the insurer had

---

**22.** If, however, the insurer breaches the insurance contract by failing to provide a defense for the insured in a suit brought against him that is covered by the policy, the insured may sue only in contract. *Leader Nat'l Ins. Co. v. Smith*, 177 Ga.App. 267, 339 S.E.2d 321, 328–29 (1985); *cf. Argonaut Ins. Co. v. Atlantic Wood Indus.*, 187 Ga.App. 471, 370 S.E.2d 765, 769 (1988) ("an insured has a claim for breach of contract if the insurer refuses to afford a defense that it has contracted to provide"), *rev'd on other grounds*, 258 Ga. 800, 375 S.E.2d 221 (1989). It is unclear whether the insured may sue the insurer, in tort, for negligence and bad faith in the conduct of the defense.

In one Georgia case, the insured attempted to sue in tort for the insurer's "fail[ure] to fulfill its contractual duty to defend, which included among other things the duty to advise the insured what its position was with respect to defending, the duty to prevent default and prejudice to the insured, and the duty to act in good faith and deal fairly in all of these matters." *Smith*, 339 S.E.2d at 328. The court dismissed the tort claim, as the insured did not assert the breach of a duty "independent of the contract" duty. *Id.* at 328–29 ("contractual duty to defend" includes "a duty to act in good faith and deal fairly" toward insured and duty to give insured's interests equal consideration with the insurer's, but this duty merely "states a standard against which fulfillment [of the contract] is to be measured" and is not "a legal duty over and above the contract obligations to defend so as to render its violation a tort"); *cf. Macon–Bibb County Hosp. Auth. v. Continental Ins. Co.*, 196 Ga.App. 399, 396 S.E.2d 50, 52 (1990) ("the duty of an insurer to defend its insured is determined by the contract of insurance"). A case from our predecessor circuit interpreting Georgia law, however, implies in dicta that the insured may sue in tort when the insurer did not defend the insured "with that care which a prudent insurer would exercise." *Smoot v. State Farm Mut. Auto. Ins. Co.*, 299 F.2d 525, 533–34 (5th Cir. 1962) (implying tort action possible for insurer's "nominal defense" in which insurer employed adjusters with "insufficient judgment or ability either to direct or to choose a prudent course of action or determine in intelligent good faith just what the case was worth in terms of the probabilities of success or failure in the event of trial"); *see also* 14 G. Couch, R. Anderson & M. Rhodes, Cyclopedia of Insurance Law § 51.78 (rev. ed. 1982) [hereinafter Couch Cyclopedia of Insurance Law].

The plaintiffs argue that their claim is based on St. Paul's negligent and bad faith defense of Ross' suit; because the essence of their complaint, however, is that whatever negligence St. Paul evinced in handling the claim resulted in its failure to effect an early settlement of the suit, we treat their claim as a failure to settle claim and do not consider whether Georgia law will allow a claim for an insurer's tortious defense of a suit when the negligence may have injured the insured other than through a failure to settle or a delayed settlement. *See infra* note 36.

**23.** Generally, when a defendant violates a duty to the plaintiff imposed by tort law but arising from the contract, the plaintiff may sue in either contract or tort. *See Mauldin*, 150 S.E.2d at 154; *Leonard*, 111 S.E.2d at 775; *see also* 14 Couch Cyclopedia of Insurance Law, *supra* note 22, § 51.25. The plaintiffs in this case have chosen to sue in tort; they ask for damages beyond those contemplated by the insurance contract.

a duty to settle the case, breached that duty, and its breach proximately caused damage to the insured beyond the damages, if any, contemplated by the insurance contract. Moreover, the insurer does not have an absolute duty to settle, *Evans,* 156 S.E.2d at 812,[24] but is liable only after the duty to settle has arisen and it has breached that duty. The issues in this case are (1) whether the insurer is liable for its negligent, as well as bad faith, failure to settle; (2) whether the insurer's duty to settle arises only when the injured party offers to settle within limits; and (3) whether the insured may recover from the insurer's failure to settle only when a judgment in excess of the policy limits has been entered against him. As the following discussion indicates, Georgia law does not clearly answer these questions.

## 1.

■ As St. Paul points out, and the plaintiffs admit, Georgia law is clear that in a case in which a liability insurer defending a claim brought against its insured refuses, in bad faith, an offer to settle within the policy limits, and an excess judgment is entered against the insured, the insured may recover the amount by which the judgment exceeds the policy limits. The Georgia Supreme Court has stated that

> where a person injured by an insured offers to settle for a sum within the policy limits, and the insurer refuses the offer of settlement, the insurer may be liable to the insured to pay the verdict rendered against the insured even though the verdict exceeds the policy limit of liability.

*McCall v. Allstate Ins. Co.,* 251 Ga. 869, 310 S.E.2d 513, 514 (1984). The policy behind this rule is that the insurer " 'may not gamble' with the funds of its insured by refusing to settle within the policy limits." *Id.* 310 S.E.2d at 515. That court has also stated, in similar language, that

> [i]t is no longer open to question in this State that the claim of an insured under

a[ ] . . . liability policy for damages on account of the bad faith tortious refusal of the insurer to settle a liability claim against him within the policy limits resulting in damage to him in the form of a judgment in excess of the policy limits being returned against him is a legitimate charge against the insurer upon which recovery may be had by the insured.

*Shaw v. Caldwell,* 229 Ga. 87, 189 S.E.2d 684, 687 (1972). Many other Georgia cases echo this language. *See, e.g., Government Employees Ins. Co. v. Gingold,* 249 Ga. 156, 288 S.E.2d 557, 558–59 (1982); *Lovett,* 357 S.E.2d at 260; *Cotton States Mut. Ins. Co. v. Fields,* 160 Ga.App. 740, 128 S.E.2d 358, 359 (1962). Moreover, the vast majority of cases in which the Georgia courts have imposed liability for an insurer's failure to settle have undoubtedly involved the insurer's bad faith refusal of an offer within limits that resulted in an excess judgment against the insured.

## 2.

Georgia law is ambiguous, however, as to whether an insured may recover for the insurer's negligent, as well as bad faith, failure to settle. Some Georgia cases imply that only bad faith is actionable. *See Jones v. Southern Home Ins. Co.,* 135 Ga. App. 385, 217 S.E.2d 620, 623 (1975) ("It is not the mere refusal to settle, but the refusal *in bad faith* which subjects the insurer to a damage action."), *cert. denied and appeal dismissed,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976); *Cotton States Mut. Ins. Co. v. Phillips,* 112 Ga. App. 600, 145 S.E.2d 643 (1965) (test for insurer's liability is that its failure to settle was "capricious and constituted bad faith"). Other cases are ambiguous on the issue or blend the negligence and bad faith standards. *See Hall v. Preferred Acc. Ins. Co.,* 204 F.2d 844, 847, 848 (5th Cir.1953) ("contrary to the better reasoned cases," some jurisdictions allow recovery for negligent failure to settle; Georgia seems to allow recovery only for bad faith actions,

---

**24.** Unless, of course, such an absolute duty to settle is imposed by the terms of the contract.

Nothing indicates that this is the case here.

but in case at hand there was "no sufficient showing ... of either negligence or bad faith");[25] *Gingold*, 288 S.E.2d at 559 (recognizing claim for bad faith failure to settle; assuming, without deciding, that insureds also may sue for negligent failure to settle).

Still other Georgia cases explicitly recognize a claim for negligent failure to settle. The court of appeals, in *Home Insurance Co. v. North River Insurance Co.*, 192 Ga.App. 551, 385 S.E.2d 736, 741 (1989), has recently stated that under "well settled Georgia law," an insured may recover damages caused by the insurer's negligent refusal to settle; the Georgia cases that refer to recovery "predicated on a bad faith refusal to settle and make no reference to the availability of a recovery for a negligent refusal to settle ... should not be viewed as inferring that a mere negligent refusal is inadequate to support a recovery." *See also McCall*, 310 S.E.2d at 514 (insured may recover when insurer is "guilty of negligence or of fraud or of bad faith" in failing to settle); *Davis II*, 288 S.E.2d at 233 (plaintiffs may sue, in tort, for negligent failure to settle); *Evans*, 156 S.E.2d at 811, 812 (describing "the duty owed by any prudent insurer to refrain from taking an unreasonable risk on behalf of its insured"); *Francis v. Newton*, 75 Ga.App. 341, 43 S.E.2d 282, 284 (1947) (insured may recover "where the insurer is guilty of negligence or of fraud or of bad faith in failing to adjust or compromise the claim to the injury of the insured"); *cf. Smoot v. State Farm Mut. Auto. Ins. Co.*, 299 F.2d 525, 533 (5th Cir.1962) (*Smoot I*) (in 1962, Georgia law on whether standard was bad faith or negligence was "fluid," but "[a] considerable body of Georgia law ... strongly indicate[d] that Georgia may, if it has not already done so, adopt the negligence concept"). We do not attempt to

clarify this area of Georgia law,[26] but assume, as suggested by the 1989 decision in *Home Insurance Company*, that negligent, as well as bad faith, failure to settle is actionable in Georgia.

### 3.

Georgia law is also unclear as to whether the insured may recover for the insurer's failure to settle when the injured party never offered to settle within the insured's policy limits. No Georgia court has stated explicitly that the insured may recover for the insurer's tortious failure to settle *only* when the insurer has refused an offer within the policy limits, and there is some support in Georgia law both for the plaintiffs' argument that such an offer is not a prerequisite for liability and for St. Paul's position.

As authority for its argument that Georgia law requires the insured to show an offer within the policy limits for the insurer to be liable, St. Paul points to cases stating that when an insurer refuses, in bad faith, an offer within its insured's policy limits *and* a judgment in excess of the limits is entered against the insured, the insurer is liable. *See, e.g., McCall*, 310 S.E.2d at 515; *supra* pp. 1545–1546. St. Paul also cites cases indicating that an insurer must give the interests of its insured equal consideration with its own, but contends that the insurer has a duty to consider the interests of the insured only "in deciding whether to accept an offer of settlement within the policy limits." *Davis II*, 288 S.E.2d at 237; *Great Am. Ins. Co. v. Exum*, 123 Ga.App. 515, 181 S.E.2d 704, 707 (1971).

St. Paul's principal support for its position is *Cotton States Mutual Insurance Co. v. Fields*, 106 Ga.App. 740, 128 S.E.2d 358, 359–60 (1962), which, it argues, held that an insured may not recover for the

---

**25.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**26.** In any case, the difference in the standards of negligence and bad faith may be only semantic. *See Evans*, 156 S.E.2d at 811 (difference

between bad faith and negligence is "mere terminology" and "means little"); Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv.L.Rev. 1136, 1140 (1954) ("The distinction between the 'bad faith rule' and the 'negligence rule' is less marked than these terms would suggest.").

insurer's failure to settle when the injured party never offered to settle within the insured's policy limits. *Fields,* however, did not state that an offer within policy limits was a prerequisite for an action for tortious failure to settle. It held instead that when the insured did not allege either that the injured party made an offer of settlement or any *"facts ... which show that the ... insurer could have successfully effected a settlement of the suit within the policy limits if it had attempted to do so,"* but instead based its suit on "the *mere supposition* that if the defendant insurer had made an offer of compromise, then possibly the suit against the insured could have been settled within the policy limits," the claim was "too remote, conjectural, contingent and speculative to afford the basis for recovery." *Id.* 128 S.E.2d at 359–60 (emphasis added).

According to St. Paul, these cases create a rule that liability exists *only* when there has been an offer within the policy limits. This authority, however, clearly supports only the proposition that liability may exist when there has been an offer within limits; it does not make such an offer a requirement for recovery. *Fields* holds, moreover, that if an insured shows either a settlement offer or that the insurer, if it had tried, could have settled within the policy limits, he states a cause of action for tortious failure to settle.[27]

The plaintiffs, on the other hand, argue that some Georgia law supports the argument that an offer within policy limits is not a prerequisite to recovery. They assert that cases stating that a liability insurer "may be liable for damages to its insured for failing to adjust or compromise the claim of a person injured by its insured ..., where the insurer is guilty of negligence or of fraud or bad faith in failing to adjust or compromise the claim to the injury of the insured," *McCall,* 310 S.E.2d at 514; *Francis,* 43 S.E.2d at 284, support their position that Georgia law permits recovery for tortious failure to settle even if there was no offer within the policy limits.

Moreover, the plaintiffs state, Georgia law requires the insurer to give the interests of its insured the same faithful consideration it gives its own interests, *Evans,* 156 S.E.2d at 811,[28] not only in deciding whether to accept an offer of settlement within the policy limits (as St. Paul contends), but also in deciding whether to effect a settlement when the injured party makes no offer, *cf. National Serv. Indus. v. Hartford Accident & Indemnity Co.,* 661 F.2d 458, 461 (5th Cir. Unit B Nov. 16, 1981) (duty of equal consideration "in making decisions concerning the litigation and the settlement of a claim").[29]

The plaintiffs also point to language from the Fifth Circuit's decision in *Smoot v. State Farm Mutual Automobile Insurance Co.,* 299 F.2d 525, 533 (5th Cir.1962) (*Smoot I*), which indicated that under Georgia law an insurer has a general duty to avoid bad faith (and, perhaps, to avoid negligence) when it defends an insured and conducts settlement negotiations on his behalf. Although there was an offer within the policy limits in *Smoot,* the court implied, in dicta, that the insurer may be liable for its breaches of duty regardless of whether such an offer existed:

the principal thrust of [the negligence claim] is directed at actions other than

---

**27.** St. Paul also asserts that the court in *Government Employees Insurance Co. v. Gingold,* 249 Ga. 156, 288 S.E.2d 557 (1982), held that the insured may not sue his insurer alleging the mere possibility that the case could have been settled, but instead must show an offer within the policy limits. The holding in *Gingold,* however, did not reach that far; the court instead found that when settlement was in fact impossible, because the insured was unavailable to give his consent, the insured could not later sue the insurer for tortious failure to settle. Because "no settlement was in fact possible, [the] excess

liability action, which is premised on the *possibility* of settlement" could not succeed. *Id.* at 558 (emphasis added).

**28.** It is not, however, required to give the interests of the insured *"paramount"* consideration. *National Emblem Ins. Co. v. Pritchard,* 140 Ga. App. 350, 231 S.E.2d 126 (1976).

**29.** In *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

rejection of settlement offers. There is the charge ... that ... the [insured's defense] was being directed by adjusters or other functionaries having insufficient judgment or ability either to direct or to choose a prudent course of action or determine in intelligent good faith just what the case was worth in terms of the probabilities of success or failure in the event of trial. *Nothing in Georgia law indicates that as to these and similar matters it will vary from the usual standard requiring that the contract be performed prudently, i.e., with that care which a prudent insurer would exercise.*

*Id.* at 533–34. *See also Evans,* 156 S.E.2d at 811 ("With respect to whether to settle or try the case, the insurer ... must use such care as would have been used by an ordinarily prudent insurer with no policy limit applicable to the claim. The insurer is negligent in failing to settle if ... such ordinarily prudent insurer would consider that choosing to try the case (rather than to settle on the terms by which the claim could be settled) would be taking an unreasonable risk...." (quoting Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv.L.Rev. 1136, 1147 (1954)).

Finally, the plaintiffs argue that in one Georgia case, a court allowed an insured to recover for the insurer's failure to settle when the facts did not clearly indicate that the injured party had offered to settle. In *Alexander Underwriters General Agency, Inc. v. Lovett,* 182 Ga.App. 769, 357 S.E.2d 258 (1987), the insurer received notice of an offer to settle that was not addressed to it

and related to a no-fault personal injury protection claim rather than the bodily injury liability claim on which the tortious failure to settle suit was based. The court found that the jury was entitled to consider this evidence in deciding whether the insured put the insurer on timely notice that the injured party was willing to settle within the policy limits and that the jury could conclude from this evidence that the injured party "was willing to settle within the limits of the coverage in the suit against [the insured] for bodily injury." *Id.* 357 S.E.2d at 263. This language implies that an offer to settle within the policy limits is not a prerequisite for a suit for failure to settle, so long as the insured shows that the insurer had notice that the injured party was willing to settle within the policy limits.[30] *See also Gingold,* 288 S.E.2d at 558 ("excess liability action ... is premised on the *possibility* of settlement" (emphasis added)).

As the foregoing discussion shows, Georgia law does not clearly require the insured to show that the insurer refused an offer within the policy limits to establish liability for tortious failure to settle, but it does not foreclose the argument that such an offer is required before the insured may recover.[31] At a minimum, however, Georgia law mandates that the insured show that settlement was possible—the case could have been settled within the policy limits, *see Fields,* 128 S.E.2d at 358—and that the insurer knew, or reasonably should have known, of this fact, *see Lovett,* 357 S.E.2d at 258. The best evidence that the case could have been settled, of course, is the

---

**30.** Other language in *Lovett,* however, implies that this notice actually was an offer within the policy limits. *See* 357 S.E.2d at 265 (referring to "the offer by [the claimant] to settle within the limits"); *id.* at 263 (stating "it is beyond dispute that the insurer did not ... accept an offer to settle within the limits of the policy coverage").

**31.** Many cases from other jurisdictions hold that an offer within the policy limits is not a prerequisite for recovery for tortious failure to settle when the opportunity for settlement existed and the insurer failed to effect a settlement, either negligently or in bad faith as the law of the jurisdiction requires. *See, e.g., Coleman v. Holecek,* 542 F.2d 532, 537 (10th Cir.1976) (Kansas

law); *Bell v. Community Ins. Co.,* 280 F.2d 514, 516 (3rd Cir.1960) (Pennsylvania law); *State Auto. Ins. Co. v. Rowland,* 221 Tenn. 421, 427 S.W.2d 30, 34–35 (1968); *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 N.J. 474, 323 A.2d 495, 504–05 (1974); *Cernocky v. Indemnity Ins. Co. of N. Am.,* 69 Ill.App.2d 196, 216 N.E.2d 198, 204 (1966); *General Accident Fire & Life Assurance Corp. v. American Casualty Co.,* 390 So.2d 761, 765 (Fla.Dist.Ct.App.1980) (but implying that demand within policy limits may be required when insured is judgment proof), *cert. denied,* 399 So.2d 1142 (Fla.1981). *But see Fulton v. Woodford,* 26 Ariz.App. 17, 545 P.2d 979, 984 (1976) (insurer's duty arises only when offer within policy limits or policy limits plus amount insured will pay).

existence of an offer within the policy limits; liability in the absence of such an offer will be rare. We assume, however, that if the insured alleges facts showing that the insurer knew, or reasonably should have known, that the case could have been settled within the policy limits—i.e., if the insurer had offered the policy limits, the injured party would have accepted—and the insurer failed to effect a settlement within a reasonable time, the insured states a cause of action for tortious failure to settle.

## 4.

Finally, Georgia law is unclear as to whether an insured, in the absence of a judgment against him in excess of his policy limits, may recover for an insurer's negligent or bad faith failure to settle when the insured has suffered foreseeable injury from the insurer's actions—i.e., whether the insured may recover damages caused by a delay in settlement, including damages for emotional distress, even when the case is ultimately settled. No Georgia case explicitly imposes a requirement of an excess judgment, and Georgia law provides some support for the plaintiffs' assertion that an excess judgment is not required.

St. Paul points to cases indicating that *when* such a judgment has been entered, the insurer *may* be liable; for instance, *Shaw*, 189 S.E.2d at 687, states that the insurer may be liable for refusing, in bad faith, an offer of settlement when its refusal "result[s] in damage to [the insured] *in the form of a judgment in excess of the policy limits being returned against him.*" (Emphasis added.) These cases, however, do not state that the insured may recover *only* when an excess judgment has been entered against him.

The plaintiffs, on the other hand, direct our attention to *Davis v. Cincinnati Insurance Co.*, 160 Ga.App. 813, 288 S.E.2d 233 (1982) (*Davis II*). An injured party sued the insured and offered to settle; the insurer denied coverage and failed to defend the suit or accept a settlement offer, and the trial court entered a judgment for $99,000 against the insured. In its first decision in the case, *Davis I*, the Georgia court held that the claim against the insured was indeed covered by a policy issued by the insurer, which had a limit of $100,000. *Cincinnati Ins. Co. v. Davis*, 153 Ga.App. 291, 265 S.E.2d 102, 105 (*Davis I*), *cert. dismissed*, 246 Ga. 46, 268 S.E.2d 352 (1980). Because the judgment entered against the insured was only for $99,000, no judgment in excess of the policy limits was entered. Moreover, the insurer eventually paid the full amount of the judgment. In *Davis II*, however, the court nonetheless upheld, without specifically considering whether the absence of an excess judgment or the insurer's payment of the full judgment foreclosed the claim, a jury verdict granting the insured $10,000 in damages for the company's tortious failure to accept bona fide settlement offers. *Davis II*, 288 S.E.2d at 238.

The plaintiffs also assert that general language in some cases indicating that an insured may recover when "the insurer is guilty of negligence or of fraud or bad faith in failing to adjust or compromise the claim *to the injury of the insured,*" see, *e.g., McCall*, 310 S.E.2d at 515, shows that Georgia law allows them to recover damages proximately caused by the insurer's tortious failure to settle regardless of whether there was an excess judgment. Furthermore, they cite cases in which courts have allowed the insured to recover economic damages caused by the insurer's failure to settle in addition to the amount of the excess judgment. *See Smoot I*, 299 F.2d at 529 (under Georgia law insured need not actually pay excess judgment against him to recover "foreseeable" damages, which include the likelihood of "crippling jeopardy to one's business or personal financial stability," such as damage to credit resources and the danger of bankruptcy); *State Farm Mut. Auto. Ins. Co. v. Smoot*, 381 F.2d 331, 338–40 (5th Cir. 1967) (*Smoot II*) (affirming jury verdict awarding damages for plaintiff's inability to sell house because outstanding judgment operated as lien and for destruction of credit as a result of foreclosure; in tort action, "[i]t is the prerogative of the jury to award [general] damages in an amount con-

sistent with the evidence"), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1248, 20 L.Ed.2d 105 (1968).

As the foregoing discussion shows, Georgia law does not clearly require an insured to show that an excess judgment has been entered to recover for an insurer's negligent or bad faith failure to settle; it does not, likewise, eliminate the possibility that such a judgment is required for recovery.[32] We assume that the insured must show that he has suffered actual injury proximately caused by the insurer's failure to settle the suit within a reasonable time after settlement was possible.[33] The most telling evidence of foreseeable damage, of course, will almost always be the entry of a judgment in excess of the policy limits.[34]

5.

Because Georgia law does not clearly support either the plaintiffs' or St. Paul's position, we assume, for the sake of argument, that the plaintiffs correctly state Georgia law: when a liability insurer knows or in the exercise of ordinary care should know that a suit against its insured could be settled within the policy limits and that its failure to settle will expose the insured to an unreasonable risk of harm, including emotional distress, the insurer has a duty to effect a settlement within a reasonable time after settlement is possible; if the insurer breaches this duty, it is liable for all damages proximately caused by its breach, including damages caused by a delay in settlement. We have doubts, however, that such a rule of law is justified from a policy standpoint.

We note, first, that the plaintiffs' position, taken to its logical extreme, would make an insurer, once it received notice that settlement was possible and that a delay in settlement would cause its insured undue emotional distress, liable for a delay in settlement even if the insurer ultimately settled the suit for less than the figure for which settlement was originally possible. In other words, the insurer has a duty continually to monitor the anxiety of its insured. Under this rule of law, an insurer's conduct of the defense of an injured party's suit against its insured would be governed not by the merits of the injured party's claim but by the possibility that if the insurer delays forcing a settlement as soon as settlement is possible, even if such a settlement is not justified or a delay would induce the injured party to settle for

**32.** Courts in other jurisdictions have held or implied that an excess judgment is not a prerequisite to recovery when other damages from the insurer's tortious failure to settle exist. *See Potomac Ins. Co. v. Wilkins Co.,* 376 F.2d 425, 429 (10th Cir.1967) (insured may recover excess of settlement over policy limits); *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138, 1142 (Colo.1984) (en banc) (excess judgment not a prerequisite to recovery); *Town of Poland v. Transamerica Ins. Co.,* 53 A.D.2d 140, 385 N.Y.S.2d 987, 990 (1976) (insured recovered excess of settlement over policy limits when insurer not induced to settle in reliance on insured joining in settlement); *Fireman's Fund Ins. Co. v. Security Ins. Co.,* 72 N.J. 63, 367 A.2d 864, 871–73 (1976) (when insured settled case after insurer refused to contribute policy limits, insured recovered policy limits); *Cowden v. Aetna Casualty & Surety Co.,* 389 Pa. 459, 134 A.2d 223, 227 (1957) (case settled over policy limits; insured recovered excess over amount he had been willing to contribute). *But see Kelly v. Williams,* 411 So.2d 902, 903–05 (Fla.Dist.Ct. App.) ("a cause of action for bad faith arises when the insured is *legally obligated* to pay a judgment that is in excess of his policy limits"), *cert. denied,* 419 So.2d 1198 (Fla.1982); *A.W.*

*Huss Co. v. Continental Casualty Co.,* 560 F.Supp. 513, 515 (E.D.Wis.1983) (interpreting Wisconsin law; insured has no damages when settlement within limits effected).

**33.** In *Davis II,* for instance, the insurer initially refused to pay the judgment against the insured on the basis that it was not covered by the policy. The insured, as a result, might have suffered economic damage to its credit rating and business reputation, similar to the kinds of damages allowed by the *Smoot* courts.

**34.** Since we affirm the district court's grant of summary judgment because the plaintiffs have failed to show a genuine issue as to whether St. Paul knew or reasonably should have known that the suit against Dr. Delancy could have been settled, we assume, without deciding, that Georgia law would allow an insured to recover damages for emotional distress, *compare Gorab v. Equity Gen. Agents, Inc.,* 661 P.2d 1196, 1199 (Colo.App.1983) (recovery for emotional distress) *with DiBlasi v. Aetna Life & Casualty Ins. Co.,* 147 A.D.2d 93, 542 N.Y.S.2d 187, 194–95 (1989) (no recovery for emotional distress), and for a wrongful death that is proximately caused by an insurer's breach of its duty to settle.

less, the insured will bring a tortious failure to settle claim against it.

Second, we note that if an offer within the policy limits is not a prerequisite to a tortious failure to settle suit, each insured will attempt to prove an essential element of his case—that the insurer could have settled the case within the policy limits—by introducing the after-the-fact testimony of the injured party that he would have settled within the policy limits if the insurer had offered the limits or had engaged in aggressive settlement negotiations. This testimony—what the injured party would have done had the facts been different—would be unreliable because it is speculative. *See* McCormick on Evidence 542 n. 9 (W. Cleary 3rd ed. 1984) ("Speculativeness usually arises with regard to . . . surmises about what might have happened had the facts been different. . . ."); *cf. Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892) (when state of mind of person is at issue, person's "own memory of his state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said"). In addition, this testimony, in a number of cases, might be the result of collusion between the insured and the injured party, and would therefore also be unreliable because it would be self-serving. Nonetheless, such testimony, in most cases, would create a genuine issue of material fact sufficient to defeat the insurer's motion for summary judgment, *see United States v. Davis*, 809 F.2d 1509, 1512–13 (11th Cir.1987) (defendant's "self-serving testimony, by itself, created a jury question with respect to his state of mind," when "no evidence directly contradict[ed] the defendant's depiction of his mental state," and when the testimony was not "so fantastic, so internally inconsistent, or so speculative that it had no probative value"); *Irwin v. United States*, 558 F.2d 249, 252 (5th Cir.1977), and would be admissible at trial (unless it was so speculative that the danger of unfair prejudice substantially outweighed its probative value, Fed.R.Evid. 403).

## B.

■ We assume that the plaintiffs correctly state Georgia law and that summary judgment for St. Paul is therefore inappropriate if a genuine issue remains as to whether St. Paul knew or reasonably should have known that it could have settled the claim against Dr. Delancy within the policy limits—or for the policy limits plus an amount St. Paul had notice that Dr. Delancy was willing to contribute—before settlement occurred. The standard for whether there is a genuine issue of material fact "mirrors the standard for a directed verdict": "[s]ummary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52, 106 S.Ct. 2505, 2510, 2511–12, 91 L.Ed.2d 202 (1986). The judge on summary judgment may not "weigh the evidence and determine the truth of the matter," *id.* at 249, 106 S.Ct. at 2511, and must "resolve all reasonable doubts about the facts in favor of the non-movant," *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir.1990), but "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

Based on the course of negotiations we have described in part I, the plaintiffs argue that they have adduced evidence sufficient to show that reasonable minds could differ as to whether St. Paul knew, or reasonably should have known, that it could have settled Ross' suit within the policy limits—or for the limits plus an amount it knew Dr. Delancy would contribute—before the case ultimately settled for the policy limits plus $20,000. We do not agree.[35] It is not enough for the plaintiffs

---

**35.** We note that in *Great American Insurance Co. v. Exum*, 123 Ga.App. 515, 181 S.E.2d 704 (1971), the court held, under somewhat similar circumstances, that the question of whether an insurance company had acted in bad faith should go to the jury: the insured had steadfastly denied that he was at fault, and there was a jury question as to his liability and the extent of damages, but the insurance company had set its loss reserve, *see supra* note 9, at almost the

to argue merely that the case could have been settled earlier if St. Paul had used ordinary care in investigating and defending Ross' claim.[36] Because an insurer does not have an absolute duty to settle, *Evans*, 156 S.E.2d at 812, but is liable only after the duty to settle has arisen and it has breached that duty, the plaintiffs must show that at some point during the litigation, St. Paul knew, or should have known, that it could have settled the case. The plaintiffs' brief, however, does not clearly delineate such a time in the Ross litigation. Based on our review of the record and plaintiffs' memorandum in opposition to St. Paul's motion for summary judgment, however, we posit three times at which St. Paul conceivably knew, or, if it had investigated and handled the case with ordinary care should have known, that it could have settled the case for the policy limits or the limits plus an amount it knew Dr. Delancy would contribute.[37]

### 1.

First, the plaintiffs argue that St. Paul could have settled the case for $125,000 after May 19, 1987, when Taggart notified Merryman that Ross would settle for $125,000 and that Karsman had assured him

that Dr. Delancy would contribute $25,000.[38] They assert that even though the case ultimately settled on November 16 for $120,000—$5,000 less than the figure they suggest St. Paul should have settled for—they are entitled to damages proximately caused by St. Paul's six-month delay in settlement. Plaintiffs thus contend that when an insurance company delays settlement, it may be liable for the anxiety suffered by its insured even if it ultimately settles the case for less than the amount possible earlier in the litigation. Plaintiffs cite no authority for this novel proposition, but we will assume that they state a claim for damages under Georgia law.

We find, however, that plaintiffs have not introduced sufficient evidence to show a genuine issue as to whether the case could have settled for $125,000. Plaintiffs rely on the following evidence in support of their contention. As we have described, Taggart told Karsman on May 18 that Ross would settle his claims against Dr. Delancy for $125,000 and then told Merryman, on May 19, that Karsman had implied that he would advise Dr. Delancy to contribute $25,000 toward settlement and that Dr. Delancy probably would pay this amount. Moreover, Merryman, in an internal St.

---

policy limits. *Exum* differed from this case in one important respect, however: the plaintiff clearly showed that settlement within the policy limits was possible, as the injured party had offered to settle within the limits before trial.

**36.** The plaintiffs argue, in part, that their claim is not that St. Paul failed to settle the suit but that St. Paul was negligent and acted in bad faith in its handling—its defense, investigation, and settlement negotiations—of Ross' suit. They claim that certain aspects of St. Paul's behavior—such as negligently investigating the suit, appointing one adjuster to both Dr. Delancy and Memorial, refusing to give Dr. Delancy a copy of his policy and telling him that Karsman's actions in engaging in settlement negotiations with Taggart were a violation of the policy, and refusing to engage in meaningful and aggressive settlement negotiations—damaged Dr. Delancy. The only way in which any of these specific examples of St. Paul's allegedly conduct damaged Dr. Delancy, however, is that they may have delayed settlement and dragged the litigation out. We do not ignore plaintiffs' claims that St. Paul's negligent or bad faith handling of Ross' claim damaged Dr. Delancy, but assess these claims as part of our determina-

tion whether St. Paul, in the exercise of ordinary care, should have known that it could have effected a settlement of Ross' suit.

**37.** We find that St. Paul, in its motion for summary judgment and in the depositions, affidavits, and exhibits it has filed with the court, met its initial burden of demonstrating that there is no genuine issue of material fact—whether the case could have been settled—and that, under *Celotex*, the burden shifted to the plaintiffs to show that there was indeed such an issue of fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991) ("Only [after the moving party has met its initial burden] does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.... Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial.").

**38.** Plaintiffs assert that this was a constructive offer to settle within the limits, which St. Paul refused, and that they have therefore shown an offer within the policy limits, if Georgia law requires one.

Paul memorandum dated October 9, 1987 memorializing a phone call between her and Taggart, stated that Taggart had told her (presumably during the phone call that was the subject of the memorandum) that Karsman had "assured" Taggart that Dr. Delancy would pay $25,000. Finally, Karsman asserted in deposition that even though Dr. Delancy never gave him authority to offer more than $10,000 of Dr. Delancy's money to settle the case, Dr. Delancy in reality would have paid $25,000.

St. Paul, in response, directs our attention to Karsman's letter of June 3 to Pinson in which Karsman specifically denied ever having told Taggart that Dr. Delancy would pay any amount toward settlement and, indeed, denied that he had ever engaged in settlement negotiations with Taggart at all.[39] Moreover, although Karsman now maintains, on deposition, that Dr. Delancy would have paid $25,000 or more to settle the case, it is undisputed that Karsman never informed St. Paul of Dr. Delancy's willingness to pay any amount over $10,000. Dr. Delancy, of course, continued to tell St. Paul throughout the case that Ross had no damages and that, therefore, the suit could be successfully defended.

To conclude that St. Paul actually knew or reasonably should have known that it could have settled the case for $125,000, a trier of fact would have to disbelieve Karsman's assertion, in his letter of June 3, that he never told Taggart that Dr. Delancy would pay this or any amount; his repeated assertions to St. Paul that Dr. Delancy would pay only $10,000; and his sworn deposition testimony that he never told St. Paul of his belief that Dr. Delancy would pay $25,000. St. Paul did not have a duty, in the exercise of ordinary care, to assume that Karsman was lying when he claimed that Dr. Delancy would pay only $10,000 and that he had not told Taggart that the doctor would pay $25,000 and, thus, to investigate the possibility of Dr. Delancy making a $25,000 contribution.

The evidence plaintiffs adduce—the impression Karsman may have given Taggart in their conversation of May 18 that Dr. Delancy might pay $25,000, which Taggart later conveyed to St. Paul on May 19 and October 9, and Karsman's after-the-fact deposition testimony that he believed that Dr. Delancy would have paid $25,000—is insufficient to create a genuine issue of material fact in comparison with the clear and unequivocal contemporaneous statements that Dr. Delancy would pay only $10,000. Moreover, if Karsman had clearly asserted to Taggart that Dr. Delancy would pay $25,000 for settlement, surely Ross would not have settled for $5000 less than this amount once it was clear that St. Paul would pay $100,000; instead, Taggart would have insisted on the full $25,000 that Dr. Delancy had agreed to pay. We hold, therefore, that there is no genuine issue as to whether St. Paul knew, or should have known, that it could have settled the case for $125,000.

2.

Second, the plaintiffs argue that St. Paul could have settled Ross' suit for $100,000 or less early in the litigation—within the first year—if St. Paul had aggressively pursued settlement negotiations. They have not, however, introduced sufficient evidence to show a genuine issue of material fact on this contention. Only two pieces of evidence contemporaneous to the settlement negotiations arguably support the plaintiffs' assertion. First, Karsman repeatedly notified St. Paul that he believed, based on conversations with Taggart, that Ross might accept an offer to settle for $100,000 or less. Second, Pinson (in a May 14, 1987 letter to Dr. Delancy) indicated that Svalina (Ross' lead counsel) had told Pinson that Svalina and Ross would soon meet and that Svalina hoped that Ross might tender an offer within the limits. This letter, arguably, is an indication from Ross' attorney, during the settlement negotiations, that Ross might accept $100,000 if

---

**39.** Karsman confirmed in his deposition that he never told Taggart that Dr. Delancy would pay $25,000, although he stated that Taggart may have "concluded" from their conversation, in an "iffy" kind of way, that Karsman would try to get Dr. Delancy to contribute $10,000 or $25,000.

it were offered. St. Paul, in opposition, points out that four days after this indication, Ross did tender his first settlement offer, for $25,000 in excess of the limits. Moreover, St. Paul asserts, it is undisputed that the lowest settlement authority Ross ever gave his attorneys, and the lowest offer Ross ever made, was $120,000, for which the claim was settled.

Plaintiffs bolster their slim contemporaneous evidence that St. Paul could have settled the case within the first year of litigation for $100,000 with several affidavits and depositions in which Ross and his attorneys assert, for the purpose of the instant litigation, that Ross would have accepted an offer for $100,000 if St. Paul had made such an offer early in the litigation of Ross' suit.[40] Moreover, plaintiffs infer from these after-the-fact affidavits and depositions that Ross might have made St. Paul an offer to settle for $100,000 or less if St. Paul's negotiating tactics—including its failure to make early offers, its low $40,000 response to Ross' initial offer of $250,000 for both defendants, and its "bad faith" and "general demeaning attitude"— had not discouraged him from engaging in meaningful settlement negotiations. According to Taggart, if St. Paul had acted in good faith, then he would have recommended that Ross offer to settle for $100,-000 in January 1987.[41]

The most probative of these after-the-fact assertions is Ross' affidavit of his state of mind during the litigation—he asserts now that he would have taken $100,-000 if St. Paul had offered it during the first year. As St. Paul argues, however, Ross' assessment of his state of mind is difficult to swallow when compared to his assertion, *in the same affidavit*, that he believed that the surgical instrument had caused him "severe injury," and that the suit had a settlement value of at least $250,000. Both of Ross' attorneys also asserted that they believed that the value of Ross' claim against Dr. Delancy was much higher than $100,000.

Moreover, Ross' assertion that he would have accepted $100,000 in the first year of litigation is irrelevant, because it covers only the first year of litigation, during which St. Paul was investigating and evaluating Ross' suit. Ross filed suit on May 5, 1986; Pinson took the deposition of the last of Ross' doctors on April 29, 1987. Some of this delay in discovery appears to have been due to Taggart's slowness in scheduling the depositions of Ross' doctors, *see supra* p. 1539. Nothing in Georgia law indicates that an insurer has a duty to effect settlement before it has had a fair opportunity to investigate and evaluate the case against its insured.[42]

Furthermore, St. Paul's ongoing investigation during this time revealed several disputed issues and possible flaws in Ross' claim; Dr. Delancy also assured St. Paul, in early 1987, that he thought that Ross had suffered no damages. The evidence that Ross' case may have been flawed might have put a reasonable insurer on notice that it should aggressively pursue settlement for a low figure; on the other hand, it also encouraged St. Paul to engage in further investigation before making a settlement offer and alerted it to the possibility of a successful defense of the suit. We find that the plaintiffs have not introduced evidence sufficient to show a genuine issue as to whether St. Paul was negli-

---

**40.** Ross, for instance, stated in an affidavit that if St. Paul had offered the policy limit within the first year of litigation, he would have accepted. Taggart also testified, on deposition and in affidavit, that Ross would have accepted an offer of $100,000 made within the first year; Svalina stated in affidavit that Ross would have "seriously considered" an offer of $100,000 made in the early stages of the litigation.

**41.** According to Taggart, St. Paul's initial $40,-000 offer, linked with its assertion that it would not settle the case against Memorial, "didn't

leave a good taste in anybody's mouth"; when St. Paul made it clear that it would try the case against Memorial, Ross and his attorneys decided that "it is just as easy to try it with both of them."

**42.** The affidavit is not, therefore, sufficient to create a genuine issue of material fact as to Ross' state of mind. If Ross had testified that he would have taken $100,000 to settle the case *after* St. Paul had completed its investigation, the plaintiffs' might have met their burden. *See supra* pp. 1552–1553.

gent in evaluating the claim for settlement during this time.

Moreover, St. Paul in the first year of litigation filed a motion for summary judgment on the statute of limitations issue, which was not decided until February 24, 1987. When Merryman made her initial $40,000 offer, which Taggart now asserts discouraged meaningful settlement negotiations and made early settlement within the limits improbable, the trial court had not yet ruled on whether the statute of limitations barred Ross' claim against Dr. Delancy. Certainly St. Paul was not negligent in failing aggressively to pursue settlement negotiations while it was still possible that Ross' claim against Dr. Delancy would be dismissed because it was time barred.

Lastly we note that Karsman's actions on behalf of Dr. Delancy, of which St. Paul was aware, may have made it impossible for St. Paul to settle the case for the limits or less early in the litigation. When Karsman, during his independent settlement negotiations with Taggart, informed Taggart repeatedly that Dr. Delancy was eager for an early settlement, notified him, as early as September 26, 1986, that the litigation was having an adverse effect on Dr. Delancy's physical and emotional health, and, perhaps, implied that Dr. Delancy would contribute personal funds to a settlement over the policy limits,[43] he gave Ross additional leverage that would allow him to exact a higher settlement.[44] We hold, therefore, that the plaintiffs have not shown a genuine issue as to whether St. Paul knew, or reasonably should have

known, that the case could have settled for $100,000 early in the litigation.

3.

Finally, the plaintiffs argue that St. Paul knew or reasonably should have known that the case could have been settled for $110,000 after May or June, 1987. Two pieces of evidence support this assertion. First, it is undisputed that Dr. Delancy had agreed to pay $10,000 toward settlement, and that Karsman notified St. Paul of this. Second, Karsman had the "impression," or "feeling," based on his May 18 conversation with Taggart, which he conveyed to St. Paul first in his letter of May 20, 1987 and at several other times before the case was settled in November, 1987, that Ross would accept an offer of $110,000.

This evidence does not present a question of fact sufficient to withstand a motion for summary judgment. Karsman's testimony that the case could have been settled for $110,000 is minimally probative, because it is simply a bald, speculative conclusion based on one conversation with Taggart in which Taggart stated that he thought that Ross would "seriously consider" an offer of $110,000.[45] Karsman's impression that the case could be settled for $110,000— which, according to plaintiffs, triggered St. Paul's duty to engage in settlement negotiations to effect a settlement for this amount—is based solely on Taggart's statement to Karsman about Ross' state of mind.

In contrast to Karsman's speculation that Ross might take $110,000, it is undis-

---

43. Taggart, in deposition, stated that he was not sure whether Karsman had told him that Dr. Delancy would contribute money, but "it was obvious [that] Dr. Delancy was going to have to come up with some money." Svalina asserted that Ross and his attorneys never knew before the case was settled how much Dr. Delancy was willing to pay toward settlement.

44. Merryman stated in her memorandum of October 9, 1987 to her superiors that "Dr. Delancy's personal attorney has made it impossible . . . to settle this case for anything less than [the] policy limits."

45. In his letter to Pinson on May 20, Karsman stated:

> On Monday, May 18, 1987, I received a telephone call from Tom Taggart regarding the Delancy case. Tom indicated to me that he was setting his demand for settlement against Dr. Delancy at $125,000.00. I asked Tom if this demand was negotiable. His response was that he had written authorization from Mr. Ross to settle the claim against Dr. Delancy for $125,000.00, but that *he would seriously consider an offer in the $110,000.00 range.*

(Emphasis added.) We assume, although it is not clear, that when Karsman says that "he" would consider an offer of $110,000, he meant Ross, not Taggart.

puted that the lowest settlement authority Taggart had on May 18, and the lowest offer he made, was for $125,000.[46] Taggart later stated in deposition that he had never offered Karsman $110,000,[47] but had merely told Karsman that he would try to "sell" an offer of $110,000 or $115,000 to Ross. Svalina stated, likewise, that Ross and his attorneys never indicated to Karsman that he would accept an offer of $110,000 or $115,000, although Taggart may have "encouraged" Karsman to counteroffer this sum in response to Ross' $125,000 offer.

Moreover, for a trier of fact to conclude that St. Paul knew, or should have known, that, based on Karsman's minimally probative speculation about Ross' state of mind, it could and should have settled the case for $110,000 and that it thus had a duty to engage in a series of negotiations that would lead to settlement at that figure, the trier of fact would have to disbelieve both Karsman's assertion, in his letter of June 3 to St. Paul, that he had never engaged in settlement negotiations with Taggart, and Taggart's assertion to Merryman on May 20 that Karsman had assured him that Dr. Delancy might pay $25,000 towards settlement. The trier of fact, to reach this conclusion, also would have to posit an entire series of offers and reactions which plaintiffs do not even suggest. Surely plaintiffs do not mean to imply that as soon as Karsman informed St. Paul of his impression that the case could settle at $110,000 (and of Dr. Delancy's willingness to pay $10,000), St. Paul immediately should have offered $110,000. Such an offer, far from settling the case at $110,000, would have led to further settlement negotiations and ensured that the final settlement would be more than this amount. One would have expected the plaintiffs to posit a course of negotiations in which St. Paul offered less than the target figure of $110,000, Ross responded with an offer for more, and the parties eventually compromised at $110,000. We note, of course, that St. Paul did engage Ross in settlement negotiations and acted in the defense of the suit during this time; it offered to submit the case to nonbinding arbitration, approached Ross about undergoing an independent medical evaluation, and, in October 1987, offered Ross $75,000 to settle the suit.

We find that St. Paul never knew, with any reasonable degree of certainty, nor in the exercise of ordinary care should it have known, that Ross and his attorneys might settle for $110,000. All that St. Paul knew, during the litigation, was that *Karsman thought* the case could be settled for this amount (but Dr. Delancy thought that Ross had no damages and the case could be tried successfully); Ross and his attorneys never communicated this willingness to settle to St. Paul, and their actions, including their final offer of $120,000, plainly indicate the opposite.[48] The clearest indication that the case could not have been settled for $110,000 in mid–1987 is that when the case was finally settled for $120,000 six months later, Karsman did not mention, in negotiating the settlement with Taggart, that the case could have been settled, several months earlier, for $110,000; the starting figure was $125,000. If Ross truly would have settled the case for $110,000 in May or June, one would have expected Karsman to push for settlement at $110,000 when the case settled in November. Moreover, one would have expected Karsman to have explained to Ben Delancy, before they con-

---

**46.** Karsman admitted that Taggart never made an actual demand for $110,000; the offer, pursuant to written authorization from Ross, was $125,000. Svalina and Taggart both asserted that at no time before the case was settled for $120,000 did Ross make any demand for less than $125,000 and never gave his attorneys authority to settle for less.

**47.** This assertion contradicted his earlier affidavit filed in support of the plaintiffs' brief in opposition to St. Paul's motion to dismiss, in which he stated that he *offered* $110,000 to settle the case in May 1987.

**48.** A Georgia court sustained a demurrer in a similar situation in *Cotton States Mut. Ins. Co. v. Phillips,* 110 Ga.App. 581, 139 S.E.2d 412, 415 (1964), when the insured did not allege that the case could have been settled for the policy limits plus an amount he would provide, but merely attached to the complaint a letter from the insured to the insurer which stated that the case could have been settled.

tacted Taggart, that Taggart had indicated that Ross would settle for $110,000. The undisputed evidence, however, shows that Karsman negotiated the settlement as if Taggart had never said anything about settling for $110,000.

The evidence presented by the plaintiffs does not show that St. Paul failed to pursue settlement when it was clear that settlement was possible and that further litigation would expose the insured to an unreasonable risk of harm; to the contrary, it shows that St. Paul had no contemporaneous indication that settlement within the policy limits or for the policy limits plus an amount it knew Dr. Delancy would contribute was possible and that St. Paul made reasonable settlement offers, based on its investigation of the case and its insured's evaluation of the case.

### IV.

For the reasons stated above, the decision of the district court is

AFFIRMED.

CLARK, Senior Circuit Judge, dissenting:

This case poses a question unanswered by Georgia insurance law and should be certified to the Georgia Supreme Court. The majority opinion misapprehends the issue on appeal. Plaintiffs-appellants in the trial court and here have sought damages for the emotional distress and wrongful death of Dr. Delancy resulting from St. Paul's negligent and contractual breach of its duty to settle the medical malpractice case against him.

As will be demonstrated below, the law in some states would require that when St. Paul learned (1) that this was a case of liability, (2) that the value of the case to the plaintiff exceeded $100,000, and (3) that it could not be settled for less than the policy limits, the company owed a duty to make known to its policyholder the company's willingness to pay its policy limits. This would have permitted Delancy to try to negotiate a settlement of the case.

Dr. Delancy was sued in May, 1986. Early on it became clear that Dr. Delancy or someone on the surgical team left a surgical instrument in Ross' body during the 1974 surgery. On November 14, 1986, St. Paul set its loss reserve at $100,000. In March, 1987, St. Paul's trial attorney estimated a possible liability of $200,000 and Dr. Delancy's chance of success at trial at 15%. In mid-April 1987, Merryman, the St. Paul adjuster, recommended to her superiors that St. Paul tender its policy limits to settle the case.

Instead of making known to Delancy and his attorney the assessment of Delancy's case by its attorney and its adjuster and offering to pay its full $100,000 policy limits so that Delancy could undertake unrestricted settlement negotiations, St. Paul stonewalled. This is so in spite of the fact that plaintiff Ross in May, 1987 offered to settle the case for $125,000.

A thread running through the case during this entire period was the fact that St. Paul also insured Memorial Hospital, a codefendant in the case with Delancy. It was obvious that St. Paul's interest would be served if Ross' case against both Delancy and the hospital could be settled at one time. On the other hand, it was in Delancy's interest that the case be settled as soon as possible without having to go to trial.

In letters of July 7 and September 28, Delancy's attorney urged St. Paul to offer the policy limits or the policy limits plus the $10,000 that Dr. Delancy was willing to pay at that time. Again on October 19, the attorney demanded that St. Paul offer its policy limits.

On November 16, 1987, when Delancy's son and Delancy's attorney were in adjuster Merryman's office seeking settlement, she told them she only had authority to offer $75,000. This was not true since St. Paul had on October 9 authorized payment of the full $100,000. Presumably, St. Paul or Merryman was trying to force Delancy to offer $50,000 toward the settlement offer of $125,000 and thus save itself $25,000. However, before Delancy's son and attorney left Merryman's office, she called her

superiors who told her to offer the $100,-000. Dr. Delancy died on November 25, 1987.

A letter dated August 20, 1986 written by Dr. Keith Dimond, Dr. Delancy's physician, to St. Paul's attorney states:

> As you know, I treat Herman Delancy for hypertension, peripheral vascular disease and cerebrovascular disease. He has not asked me to contact you. In fact, I don't even think he knows I am writing. In the course of the litigation against Dr. Delancy, I've seen his psychological health deteriorate. While his blood pressure control has been quite good, this process of litigation is having a profound effect on his overall health and his mental health is inexorably worsening. My sole purpose for contacting you in this regard is to urge that this process of litigation be accomplished as quickly as possible. My only concern in the whole matter is the health of my patient.

St. Paul knew from the inception of this case that Dr. Delancy's case could not be won. It is common knowledge that when doctors leave a medical instrument or foreign object in a patient's stomach, juries find in favor of the plaintiff. In March/April of 1987, St. Paul's attorney put a value of $200,000 on the case and St. Paul's adjuster recommended that the company offer its $100,000 policy limits. Had St. Paul offered its $100,000 limits during that period, plaintiffs would have no case.

The majority opinion assumes that Georgia law requires that "an insurer's duty to settle a case within the policy limits arises when the insurer knows, or in the exercise of ordinary care should know, that such a settlement is possible and that its failure to effect a settlement will expose its insured to an unreasonable risk of harm." [1] The majority then goes on to hold that plaintiffs introduced no competent evidence that shows "St. Paul knew or reasonably should have known that it could have settled the suit for Dr. Delancy's policy limits (or for the policy limits plus an amount Dr. Delancy had notified St. Paul that he was willing to pay)." [2] The majority's assumption is not the law of Georgia and its opinion seems to concede that, but the majority nevertheless refuses to certify the question to the Georgia courts.

The opinion at Section III, A.2, first sentence, states: "Georgia law is ambiguous, however, on whether an insured may recover for the insurer's negligent, as well as bad faith, failure to settle." In the last sentence the opinion states "We ... assume, as suggested by the 1989 decision in *Home Insurance Company*, that a negligent, as well as bad faith, failure to settle is actionable in Georgia."

Then in subsection 3, the opinion states: "Georgia law is also unclear as to whether the insured may recover for the insurer's failure to settle when the injured party never offered to settle within the insured's policy limits." Finally, in subsection 5, the majority states: "... we assume, for the sake of argument, that the plaintiffs correctly state Georgia law: when a liability insurer knows or in the exercise of ordinary care should know that a suit against its insured could be settled within the policy limits and that its failure to settle will expose the insured to an unreasonable risk of harm, including emotional distress, the insurer has a duty to effect a settlement within a reasonable time after settlement is possible; if the insurer breaches this duty, it is liable for all damages proximately caused by its breach, including damages caused by a delay in settlement. We have doubts, however, that such a rule of law is justified from a policy standpoint." (Op. p. 1542)

There are several flaws in the foregoing portions of the majority's opinion. In the last quoted paragraph the majority makes a totally incorrect assumption of the plaintiffs' position on the Georgia law. Earlier I have stated the plaintiff's position in this case.[3] None of the references to insurance law relied upon by the majority apply to

---

1. At 1545.

2. *Id.*

3. Paragraph two of this dissent.

the facts of this case. The appellant urges that the real question presented by the facts in this case is what duty does a company have when presented with facts that demonstrate that its insured will be found liable to an injured party whose injuries are such that the policy limits will be exceeded if the case goes to trial. The majority answers that by saying the company has no duty until presented with an offer that guarantees settlement of the case.

It is helpful again to emphasize the difference in the view taken by the majority opinion and the position urged by the appellant. In the Summary of the Argument portion of its brief, appellant states: "St. Paul owed a duty of due care, a fiduciary duty of trust and a duty of good faith in adjusting the malpractice claim made against Dr. Delancy. St. Paul owed Dr. Delancy these duties regardless of whether the malpractice claimant, Mr. Ross, made an offer to Dr. Delancy within the doctor's $100,000 policy limits." The majority opinion's opening paragraph states: "The plaintiffs ask us to hold, under Georgia law, that when a liability insurer knows or in the exercise of ordinary care should know that a suit against its insured could be settled within the policy limits and that its failure to settle will expose the insured to an unreasonable risk of harm, including emotional distress, the insurer has a duty to effect a settlement within a reasonable time after settlement is possible; if the insurer breaches this duty, it is liable for all damages proximately caused by its breach."

Since the majority opinion poses the wrong issues, I do not write in opposition to it. Instead, I write with respect to an insurer's duty to its insured when the insured is clearly liable to a plaintiff in an amount which exceeds the policy limits. It is of great consequence that St. Paul was in control of all settlement negotiations and

had forbidden in its May 29, 1987 letter to Dr. Delancy's attorney his participation in settlement negotiations, stating: "The Insured and his personal attorney 'will refrain from making any financial obligations or paying out any money without our authorization. Doing so may result in our not making reimbursement of the payment, even though the cost is covered by the policy.' " [4]

### Case Law Establishing a Broader Duty to Settle

Case law from other jurisdictions establishes that the duty to settle is not, as the majority assumes, limited to situations in which the suit could have been settled within the policy limits. The duty to settle arises whenever settlement, whether within the policy limit *or* in excess of the policy limit, will protect the interests of the insured. As the former Fifth Circuit has recognized, and stating the proposition broadly, "... the insuror must give a consideration to the interest of the insured equal to that consideration given its own interest in the matter, and it must act with good faith in all transactions involving the insured's interest." [5] Professor Keeton has summarized this principle as follows: "[T]he insurance company must in good faith view the situation as it would if there were no policy limit applicable to the claim." [6] Finally, as the Third Circuit concluded, "the fairest method of balancing the interest is for the insurer to treat the claim as if it were alone liable for the entire amount." [7]

With this general standard in mind, the Second Circuit has articulated various instances in which breach of the duty to settle may be found. Significantly, failure to accept settlement within the policy limits—to which the majority, in this case, refers—is but one example:

Where, because of the likelihood that an excess verdict will be returned, the

**4.** R. 4–101–15.

**5.** *Liberty Mutual Ins. Co. v. Davis*, 412 F.2d 475, 483 (5th Cir.1969).

**6.** Keeton, "Liability Insurance and Responsibility for Settlement," 67 Harv.L.Rev. 1136, 1148 (1954).

**7.** *Bell v. Commercial Ins. Co.* 280 F.2d 514, 515 (3d Cir.1960).

**1562**

greater financial risk of the litigation rests on the insured, a finding of bad faith on the part of the insurer may be based on such factors as these:

(1) The failure of the insurer to investigate properly the circumstances of the accident.

(2) The refusal of the insurer to accept a settlement within the limits of the policy.

(3) The failure of the insurer to inform the insured of a compromise offer.

(4) The failure of the insurer to attempt to induce contribution by the insured.[8]

The fourth factor, failure of the insurer to attempt to induce contribution by the insured, assumes that the duty to settle may arise when settlement within the policy limit is not possible; the option for the insurance company is to inform the insured of a settlement offer above the policy limit and to ascertain whether, given the value of the settlement offer, contribution by the insured would be more advantageous to the insured than litigating.[9]

An early Tennessee case [10] faced the issue of an insurance company's duty when the defendant was clearly responsible for an accident and the damages exceeded the policy limits, saying:

As to the first question, the defendant insurance company takes the position that until the injured party has offered to settle the case for an amount within the policy limits, the company is under no legal duty to attempt to effectuate a settlement. It is insisted that until such an offer is made there is no conflict of interests between the company and its insured. It is likewise argued that if the

demand is in excess of the policy limits the insurer has no authority to bind the insured by a settlement and therefore cannot be guilty of bad faith in failing to settle. After much research and thought about the matter we find ourselves unable to agree with this position.[11]

The Tennessee Supreme Court further said, quoting from *Southern Fire & Casualty Co. v. Norris,* 35 Tenn.App. 657, 668, 250 S.W.2d 785, 790 (1952):

" * * * The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in event of a claim, the insurer will have its own interests to consider. But an insured also has a right to assume that his interests will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured owes the duty of full co-operation—the insurer the duty of exercising good faith and diligence in protecting the interests of the insured."

* * * * * *

We are asked to hold as a matter of law that an insurance company cannot be held liable for bad faith for failing to settle a case when there is no demand for settlement ... within their limits of coverage.... We are of the opinion that such is not the law nor should it be so.

* * * * * *

It is true that in most of the cases dealing with the problem at hand, there has been an offer to settle for an amount within the policy limits. However, to hold as a matter of law that an insurance company cannot be guilty of bad faith unless it has received an offer of settlement within the policy limits could most

---

**8.** *Young v. American Casualty Co.,* 416 F.2d 906 (2d Cir.1969) (footnote omitted); *see also Brockstein v. Nationwide Mutual Ins. Co.,* 417 F.2d 703, 706 (2d Cir.1969) (same).

**9.** *See also Rova Farms Resort v. Investors Insurance,* 65 N.J. 474, 323 A.2d 495 (1974) ("Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or *as to the ability and willingness of the insured to pay any excess required for settlement* must be resolved in favor of the insured unless the insur-

er, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, *but also that the insured would not have contributed to whatever settlement figure above that sum might have been available.").*

**10.** *State Auto. Ins. Co. of Columbus, Ohio v. Rowland,* 221 Tenn. 421, 427 S.W.2d 30 (1968).

**11.** *Id.* 427 S.W.2d at 33.

certainly lead to inequitable results. We see nothing, under such a holding, to prevent an insurance company, in a case where liability is certain and injury great, to simply decline negotiations with the injured party and later assert that there was no offer within the policy limits.[12]

Regrettably, in this case St. Paul callously sat back and did nothing while the elderly Dr. Delancy agonized and writhed and, as his doctor, Dr. Dimond, wrote the company, his "overall health and his mental health [was] inexorably worsening." Unfortunately, the majority attempts to decide what law Georgia would apply to this case. The court admits that Georgia has sanctioned an insured collecting damages for an insurance company's tortious failure to settle a case.[13] When it faces the ultimate question posed by St. Paul's bad faith and negligent handling of the settlement of this case, the majority says: "We have doubts, however, that such a rule of law is justified from a policy standpoint." That flies in the face of the certification procedures which have been practiced over the past twenty years between our court and the Georgia Supreme Court. We have regularly honored the principle of comity by asking that court to decide cases presented to us involving yet undecided Georgia legal questions that we deem to involve policy questions which Georgia's highest court is best equipped to answer. Lastly, in Part III B. of the opinion, the majority undertakes to decide disputed issues of fact that have never been submitted to a trier of fact.

I respectfully dissent from the majority's holdings and its failure to certify this case to the Georgia Supreme Court.

---

12. *Id.* at 33–34.

13. Opn. at 1551, citing *Davis II,* 288 S.E.2d 233

